Floyd B. O'NEIL, Appellant,

v.

W. R. GRACE & COMPANY and Maryland Casualty Company, Appellees.

No. 25763.

United States Court of Appeals
Fifth Circuit.

Feb. 28, 1969.

Rehearing Denied April 8, 1969.

Louis D. Curet, Baton Rouge, La., Bryant W. Conway, Baker, La., D'Amico & Curet, by Louis D. Curet, Baton Rouge, La., for appellant.

John S. White, Jr., Kennon, White & Odom, Baton Rouge, La., for appellees.

Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.

SPEARS, District Judge:

This is a diversity action brought by the plaintiff Floyd B. O'Neil for personal injuries received in an explosion at the plant of the defendant W. R. Grace and Company (hereinafter referred to as Grace) for the alleged negligence of Grace, and against the defendant Maryland Casualty Company under the Louisiana direct action statute allowing recovery against the insurer of a tortfeasor. The case was tried before a jury, and a verdict was returned in favor of the plaintiff, assessing his damages in the amount of $43,750.00. Upon a proper motion by the defendants the trial court granted a judgment notwithstanding the verdict, and, in the alternative, a new

trial. It is from that order that this appeal is taken. At the outset, therefore, we must determine whether the plaintiff's evidence made out a prima facie case of negligence against the defendant Grace, and whether the defendants' evidence made out a conclusive case of contributory negligence against the plaintiff—that is, whether the evidence in this case was such that reasonable inferences could not be drawn that would result in findings in favor of the plaintiff on both these crucial issues. We reverse the district court and direct that judgment be entered on the verdict.

There is very little dispute as to the facts in this case, and it will be sufficient for the purposes of this opinion to briefly summarize them. The parties will be referred to as they were in the trial court. At the time of the accident plaintiff was a civil engineer employed by the H. E. Wiese Company, which, in turn, had contracted to erect some mechanical equipment in the plant of Grace. Plaintiff was in charge of the crew that was to do the construction work at the plant where Grace was engaged in manufacturing enterprises that involved the handling of dangerous gases, including the explosive gases cyclohexane and ethylene. The construction work involved some welding several feet off the ground and approximately fifty feet away from a device known as an off-specs stripper. This device was used to separate and remove from the plant waste material and to recover the explosive gas cyclohexane. It was fed by several lines from different parts of the plant, and the material flowing into it was normally at a very low pressure. From the off-specs stripper was a downspout that carried waste material to a Dempsey Dumpster located nearby. It appears that because of the explosiveness of some of the material used, several precautions were normally taken by Grace in this area, including the designation of certain personnel as being responsible for continually checking safety factors, and the requirement that before welding could take place in the area a "hot-work permit" must be issued.

The evidence indicates that on the day before the accident occurred, plaintiff applied to the proper personnel of Grace for the requisite hot-work permit needed to carry on the welding operations the next day. Apparently, because of the danger of explosion under the conditions as they existed at that time, the permit was denied. However, by the next day certain alterations in the plant had been made so that conditions for welding would be less dangerous. Both the downspout from the off-specs stripper and the Dempsey Dumpster had been wrapped with a shroud of plastic material fastened with wire. Also, the downspout had been rigged with a pipe and an air reductor which had as its purpose the sucking of fumes from the downspout and discharging them from the area. The plant safety inspector, after making a visual inspection of the precautions taken, and after conducting an explosimeter test of the area, concluded that there were no dangerous fumes in the air and that it would be safe to conduct the welding operations. He consequently issued and signed the requisite hot-work permit, which, according to its provisions, was valid for over 8 hours. It contained a statement signed by the maintenance supervisor of Grace, and by its senior operator, attesting to the fact that the area in question had been checked and that work could be done without undue hazard to persons or property. Under the heading "Precautions Taken by Oper. Dept." the permit contained the following statement: "Operator in Area, Stop at his Request." Having obtained the requisite hot-work permit, plaintiff directed the men in his crew to begin the welding operations.

Within about ten minutes after the permit had been issued, and after the welding operations had begun, plaintiff noticed that the shroud wrapped around the downspout and the Dempsey Dumpster appeared to have opened a little, and that fumes were escaping around it. He

immediately walked toward the shroud and attempted to adjust it so that it was back in its original position. There was some testimony that plaintiff was warned by two of the employees of Grace to move away from the area, but this was denied by plaintiff. There was no testimony that plaintiff was directed to have his men stop the welding operation. While plaintiff was working with the shroud, there apparently were two attempts made by employees of Grace to close certain valves and thus to shut off the flow of materials into the off-specs stripper. The senior operator for Grace attempted to turn valves that were located near the off-specs stripper, and the operator assigned to this specific area attempted to shut off valves located in a control room some distance away. However, as they were turning these valves, neither of the men looked at the gauges nearby to determine whether the material flowing into the stripper was under too much pressure. As plaintiff was adjusting the shroud, and as the valves were being shut by the operators, the explosion occurred injuring the plaintiff.

## THE ORDER GRANTING JUDGMENT NOTWITHSTANDING THE VERDICT

 The standard to be followed in ruling upon a motion for judgment notwithstanding the verdict is the same as that to be followed regarding a motion for directed verdict; indeed, a judgment notwithstanding the verdict technically is a "judgment entered in accordance with * * * [the] motion for directed verdict". Fed.R.Civ.P. 50(b). A judgment notwithstanding the verdict should not be granted unless the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable men could not disagree on the verdict. See Ricketson v. Seaboard Airline R.R. Co., 403 F.2d 836, 839 (5th Cir.1968).

 In the case now before the court, this means that the judgment notwithstanding the verdict can be affirmed only if the evidence is such that all rea-

sonable men would agree either that Grace was not negligent or that plaintiff was negligent. In making our determination we shall view the evidence in a light most favorable to plaintiff.

It was generally accepted by the trial court and by the parties in this case that the most reasonable explanation for the explosion was that a spark from the welding operations ignited the escaping fumes. We are inclined to agree; and since the jury reasonably could have reached that conclusion, we will accept it as the basis for our analysis of the evidence. The question for this court is whether the trial court erred in ruling (1) that there was insufficient evidence to go to the jury on the issue of defendant's negligence, and (2) that the evidence as to plaintiff's negligence was conclusive.

### (a) *Evidence of defendant's negligence*

In our opinion it can reasonably be inferred from the evidence that Grace was negligent, and that such negligence was the proximate cause of the explosion. The first element generally assumed to have contributed to the explosion was the escape of the fumes into the area, and there is sufficient evidence to support a finding that Grace was responsible for this. There was, for example, testimony that the off-specs stripper might have been subjected to more pressure than was normal, and that this caused the escape of the fumes. It was Grace's agents who installed the plastic shroud, who conducted the explosimeter test of the area, and who subsequently issued the hot-work permit representing that conditions would be safe for 8 hours. No doubt conditions would have been much safer if the plant had been completely shut down, but Grace decided to issue the permit after less drastic precautions had been taken, because it did not want to interrupt the manufacturing process for the welding operations.

In addition, it could be inferred from the evidence that Grace played a primary role in continuing the welding opera-

tions as the fumes were escaping. The hot-work permit stated that an operator employed by Grace would be in the area, and that if the operator requested that the welding operations be stopped his request should be heeded. Although there were two operators who saw the escaping fumes and who attempted to shut off valves in order to prevent the further escaping of fumes, neither of them requested that the welding operations be stopped.

We conclude, therefore, that there was ample evidence in the record from which the jury reasonably could have found that the acts of Grace relating to the escape of the explosive fumes, and/or with respect to the continuance of the welding while the fumes were escaping, constituted negligence proximately causing the explosion.

(b) *Evidence of plaintiff's contributory negligence*

The trial court appeared to base its decision primarily on its opinion that the evidence was conclusive that the plaintiff was guilty of contributory negligence. This question is more difficult to resolve, but after careful consideration we are of the opinion that the issue of contributory negligence was one for the jury. Clearly, there is not conclusive evidence in the record that the plaintiff was responsible for the escape of the explosive fumes. Although he was understandably interested in obtaining the hot-work permit and in performing his welding operations, and even though he was apparently satisfied with the safety precautions that had been taken at the time the permit was issued, there is no evidence that he exerted any undue pressure on Grace or any of its employees in his attempt to obtain it. Moreover, there was no evidence that his attempt to readjust and to refasten the shroud around the downspout and the Dempsey Dumpster in any way contributed to the further escape of fumes into the area. It is true that the welding operation continued while the fumes were escaping; but the jury necessarily found that plaintiff was not negligent either in stepping forward to adjust the shroud or in failing to order his crew to cease immediately the welding operations and we cannot say that this finding was without support in the evidence. His decision to reattach the shroud was apparently motivated by his extraordinary interest in preserving the safety of himself, his crew, and others in the area; and there was no evidence to the contrary. His testimony, obviously believed by the jury, was that he relied upon the hot-work permit and therefore upon the operators in the area to warn him of any unduly dangerous conditions requiring that the welding operations be stopped. As has already been noted, the regulations established by Grace required thorough investigation of the area, the taking of safety precautions, and the approval of three of their top level employees before a hot-work permit could be issued. While plaintiff agreed that he was qualified with respect to the safety conditions surrounding his construction work, he pointed out that he was not trained or experienced in evaluating the safety of conditions in manufacturing plants where explosive gases might, from time to time, escape into the air. As a consequence, he stated that when the fumes escaped he did not realize he should immediately order his men to cease their welding—he knew only that conditions had changed. Under the circumstances, we are unable to conclude as a matter of law that plaintiff was negligent in failing to order his men to cease welding. Perhaps the explosion could have been avoided if he had ordered the welding to stop when he saw the escaping fumes; but a hindsight view of his actions is not the test for negligence. His decision on what action he should take had to be made quickly, and in the light of all the circumstances then existing. The mere making of the wrong decision is not per se negligence; it is negligence only if an ordinarily prudent man, under the same or similar circumstances, would have made the right decision. We are

of the opinion that whether the ordinarily prudent man would have ordered the welding to cease, and whether that would have prevented the injuries, is a question about which reasonable men could disagree. Therefore, we hold that the trial court erred in granting the motion for judgment notwithstanding the verdict.

## THE ALTERNATIVE ORDER GRANTING MOTION FOR NEW TRIAL

The Court denied a motion for directed verdict at the close of plaintiff's case, and reserved ruling on a similar motion at the close of all the evidence. The jury verdict was received on November 8, 1967, and on November 15, 1967 a judgment for the plaintiff, approved by the district judge, was entered by the clerk. Thereafter, on November 22, 1967 the judgment was stayed pending disposition of alternative motions for judgment notwithstanding the verdict and for a new trial. On December 1, 1967, the trial judge made his ruling from the bench, in which he stated, among other things, that he did not think there was any issue of fact in the case on which reasonable men could fairly conclude that plaintiff was free from negligence. On that basis, he granted the motion for judgment notwithstanding the verdict. At the same time, he found that the verdict was contrary to the weight of the evidence, and conditionally granted a new trial. Needless to say, the jury, after having been properly instructed concerning contributory negligence, drew ultimate conclusions which obviously disagreed with the trial judge's appraisal of the evidence, and we have found ample support in the record for its verdict.

Rule 50(c), Federal Rules of Civil Procedure, as amended in 1963, now provides in pertinent part as follows:

If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed *unless the appellate court has otherwise ordered.* In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court. (Emphasis supplied.)

We recognize the proposition that a district judge may, in the exercise of his discretion, grant a new trial for reasons which would not support a judgment notwithstanding a verdict. Here, however, in conditionally granting a new trial the district judge did not assign any reason other than that the verdict was so contrary to the weight of the evidence that substantial justice could only be done by such action. The record is relatively short and singularly free from error. The issues were neither complex nor complicated. No hint or suggestion has been made that the case was improperly tried, or that any evidence was improperly admitted; or that there were any prejudicial statements of counsel; or that the charge to the jury was improper; or that the damages assessed were excessive; or that there was any newly discovered evidence. The evidence, as we have seen, was for the most part undisputed, and there is no indication that upon a new trial it would be any different. In this connection, the credibility of no witness for the plaintiff has been challenged. The only real dispute reflected in the testimony was plaintiff's denial that he was ever warned by any of Grace's employees while he was adjusting the shroud

around the downspout and the Dempsey Dumpster just prior to the explosion, and he was characterized as "one of the most honest witnesses" the trial judge had ever seen.

In Lind v. Schenley Industries, Inc., 278 F.2d 79 (3rd Cir.), cert. denied 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960), decided before the 1963 amendment to Rule 50(c), the district court had entered a judgment for the defendant, despite a jury verdict for the plaintiff, and, at the same time, had granted defendant a new trial in the event the judgment in favor of the defendant should be reversed on appeal. In considering the matter the Third Circuit pointed out the distinction between a new trial awarded because the verdict was against the weight of the evidence and one awarded for other reasons such as the improper admission of evidence or prejudicial remarks, saying:

> What we have stated demonstrates that there is no consensus of opinion as to the exact standards to be used by a trial court in granting a new trial and that the criteria to be employed by an appellate tribunal charged with reviewing the trial judge's decision in this respect are equally indefinite. New trials granted because (1) a jury verdict is against the weight of the evidence may be sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence. In the first instance given it is the jury itself which fails properly to perform the functions confided to it by law. In the latter instances something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings creating a condition whereby the giving of a just verdict was rendered difficult or impossible. In the

latter instances, (2), supra, the trial court delivered the jury from a possibly erroneous verdict arising from circumstances over which the jury had no control. Under these conditions there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial.

> But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.

278 F.2d at 90. The court then ordered judgment entered on the verdict.

*Lind* has been followed and applied in later decisions of that court as well as in the Sixth Circuit. See Lewin v. Metropolitan Life Ins. Co., 394 F.2d 608, 614–615 (3rd Cir.1968); Duncan v. Duncan, 377 F.2d 49, 52–55 (6th Cir.), cert. denied, Fain v. Duncan, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260 (1967); *See also* Neely v. Eby Constr. Co., 386 U.S. 317, 323 & n. 4, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); Bennett v. D. C. Transit System, Inc., 111 U.S.App.D.C. 411, 298 F. 2d 325, 327–328 (1962) (dissenting opinion).

Under the special circumstances of this case, since it would appear that "no undesirable or pernicious element has occurred or been introduced into the trial", and that no useful purpose could be served by submitting the same evidence to another jury, we hold that this is an appropriate case in which to reverse the conditional grant of the new trial and direct that judgment be entered on the verdict.

This case is reversed and the trial court is directed to reinstate the judgment for the plaintiff entered on November 15, 1967.

Reversed and rendered.

## ON PETITION FOR REHEARING

### PER CURIAM:

In their petition for rehearing defendants strenuously argue that the trial court's action in finding the plaintiff guilty of contributory negligence as a matter of law is amply supported by the undisputed evidence showing, among other things, that plaintiff "actually participated in taking precautionary measures to fasten the shroud around the equipment and to install the air eductor"; that he was "in control of the welding work which was taking place at the time of the explosion or fire"; that he "could have stopped the welding work at any time by merely signaling or speaking to a man under his supervision who was stationed on the ground below the welder, and he did not do that"; and that he "knew that welding in proximity to the vapors could cause an explosion or fire".

In determining the sufficiency of the evidence to raise a question of fact for the jury in diversity cases, federal courts must apply a federal test. Planters Manufacturing Co. v. Protection Mutual Insurance Co., 380 F.2d 869 (5th Cir. 1967). Precedents with varying factual situations are, of course, helpful, but almost no case is a precise replica of another, so the court, in each case, must determine whether, under the particular facts of that case, the issue of negligence or contributory negligence presents a question of law for the court or one of fact for the jury. See Texas & Pacific Railroad Co. v. Laborde, 257 F. 2d 587, 590 (5th Cir. 1958).

We have in our original opinion fully stated our views, especially under the heading, *"Evidence of plaintiff's contributory negligence"*. The question was whether the ordinarily prudent man in plaintiff's position would have recognized the danger inherent in the situation and either ordered the welding to stop or fled from the dangerous area, or both, in time to prevent the injuries that plaintiff suffered. After having restudied the entire record in the case, we remain convinced that that question was one about which reasonable men could disagree. The trial court correctly submitted the issue of contributory negligence to the jury under proper instructions,[1] but its subsequent action in

---

1. The court in his charge stated in part as follows:

 "Then they (defendants) say even if you find that W. R. Grace was negligent, that the plaintiff was also negligent, which is contributory negligence. Now, negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care in the management of one's person or property. Ordinary care is that care which persons of ordinary prudence exercise in the management of their own affairs. You will note that the person whose conduct is set up as a standard is not the extraordinarily cautious individual nor the exceptionally skilful one, but a person of reasonable and ordinary prudence. While exceptional skill is to be admired and even encouraged, the law does not demand it as a general standard of conduct.

 "Now, when I give you this definition of negligence, you must realize that the same definition applies to both plaintiff and defendant. Plaintiff must prove the defendant guilty of negligence proximately causing the accident if he is to prevail. Whether or not he is negligent

**916**

granting judgment for defendants notwithstanding the verdict favorable to plaintiff was erroneous. Accordingly, the petition for rehearing is denied.

will be determined when you apply the facts of the case to the law that I am *giving you on negligence. I will give* you some additional definitions in a moment.

"On the other hand, the plaintiff says —the defendant says that plaintiff was negligent. This is contributory negligence. Now, negligence or contributory negligence must be measured by the facts applied to the law or to this law that I have given you. The standard of care goes both ways. Contributory negligence is conduct for which plaintiff is responsible amounting to a breach of duty which the law imposes upon a person to protect himself from injury, and which concurring or cooperating with actionable negligence for which the *defendant is responsible, contributes to* the injury complained of as a proximate cause.

"Contributory negligence may be due to either acts of omission or acts of commission. It may consist of doing the wrong thing at the time and place in question or it may arise from doing nothing when something should have been done. That is contributory negligence. The defendant bears the burden of proving that on the part of the plaintiff by a preponderance of the evidence."